# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

VISIBLE CONNECTIONS, LLC,          §
                                   §
              Plaintiff,           §
                                   §
       v.                          §    Civil Action No. 1:18-CV-859-RP
                                   §
ZOHO CORPORATION                   §
                                   §
              Defendant.           §
                                   §

## ZOHO CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    LEGAL STANDARDS ......................................................................................... 2

       A.   Claim Construction Standards ................................................................... 2

       B.   Indefiniteness Standards ............................................................................ 3

I.     THE '203 PATENT ............................................................................................ 4

       A.   Background .................................................................................................. 4

       B.   Asserted Claims .......................................................................................... 8

       C.   '203 Patent Claim Terms for Construction ................................................ 9

             1.     Preambles of claims 34 and 37 ........................................................ 9

             2.     Interface Program ........................................................................... 10

             3.     Call Manager ................................................................................... 11

             4.     Claims 35, 36, 38 and 39 Are Indefinite Because They Impermissibly Combine Apparatus and Method Claim Elements ................................................................. 14

             5.     Claims 35, 36, 38 And 39 Are Indefinite Because They Include a Term of Degree Without Specifically Delineated Metes and Bounds .......................................... 16

             6.     Document (Claims 35, 36, 38 and 39) ............................................ 19

             7.     Automatically (Claims 35, 36, 38 and 39) ..................................... 21

III.   THE '392 PATENT ........................................................................................... 21

       A.   Background ................................................................................................ 21

       B.   Asserted Claim of the '392 Patent ........................................................... 22

       C.   The '392 Patent Claim Terms for Construction ........................................ 24

             1. Claim 1 Preamble ................................................................................ 24

             2. "generating a unique temporary code when a data connection is established" ........ 25

IV.    CONCLUSION .................................................................................................. 26

# TABLE OF AUTHORITIES

## CASES

*Bicon, Inc. v. Strauman Co.*, 441 F.3d 945 (Fed. Cir. 2006) ........................................................ 25

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801 (Fed. Cir. 2002) ................... 25

*Chimie v. PPG Indus., Inc.*, 402 F.3d 1371 (Fed. Cir. 2005) ....................................................... 20

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005) ........................... 4, 17

*Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331 (Fed. Cir. 2006) ........................... 25

*Effective Exploration, LLC v. Bluestone Nat. Res. II, LLC*, 2017 WL 3193322 (E.D. Tex. July 27, 2017) ........................................................................................................................................ 18

*Ekchian v. Home Depot, Inc.*, 104 F.3d 1299 (Fed. Cir. 1997) .................................................... 20

*Fairfield Indus., Inc. v. Wireless Seismic, Inc.*, 2015 WL 1034275 (S.D. Tex. Mar. 10, 2015)... 18

*Fenner Investment Co. v. Cellco Partnership,* 778 F.3d 1320 (Fed. Cir. 2015) ......................... 20

*Fenner Invs., Ltd. v. Cellco P'Ship*, 778 F.3d 1320 (Fed. Cir. 2015) ............................................. 2

*Fiber, LLC v. Ciena Corp.*, 2017 WL 3896443 (D. Colo. Sep. 6, 2017) ..................................... 18

*Globetrotter Software, Inc. v. Elan Computer Group Inc.*, 362 F.3d 1367 (Fed. Cir. 2004). .. 3, 11

*Halliburton Energy Servs.,* 514 F. 3d 1244 (Fed. Cir. 2008) ...................................................... 17

*H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329 (Fed. Cir. 2014).................................. 15

*In re Walter*, 698 Fed. Appx. 1022 (Fed. Cir. 2017) ................................................................... 17

*Info-Hold, Inc. v. Muzak, LLC*, 783 F.3d 1365 (Fed. Cir. 2015) .......................................... 25, 26

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004) .... 2

*Interval Licensing, LLC v. AOL, Inc.*, 766 F. 3d 1364 (Fed. Cir. 2014)...................................... 17

*IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005)........................... 2, 14

*Katz Interactive Call Processing Patent Litig. v. Am. Airlines, Inc.*, 639 F.3d 1303 (Fed. Cir. 2011) .................................................................................................................................... 15, 16

*Kropa v. Robie*, 187 F.2d 150 (CCPA 1951).............................................................................. 25

*Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340 (Fed. Cir. 2004).......................................... 21

*Mobile Telecomms. Techs., LLC v. Leap Wireless Int'l, Inc.*, No. 2:13-CV-885-JRG-RSP, 2015 WL 2250056 (E.D. Tex. May 13, 2015)...................................................................................... 9

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120 (2014) ...................................... 3, 4, 17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) ................. 2

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ............................................................... 2

*Qcue, Inc. v. Digonex Techs., Inc.*, A-12-CA-484-SS, 2013 WL 4784120 (W.D. Tex. Sept. 5,

2013) ................................................................................................................... 18

*Rembrandt Data Techs., LP v. AOL, LLC,* 641 F.3d 1331 (Fed. Cir. 2011) ............................... 15

*Renishaw PLC v. Marposs Societa' per Azioni,* 158 F.3d 1243 (Fed. Cir. 1998) ......................... 3

*Retractable Techs., Inc. v. Becton, Dickinson & Co.,* 653 F.3d 1296 (Fed. Cir. 2011) ........... 2, 11

*Seachange Int'l, Inc. v. C-COR, Inc.,* 413 F.3d 1361 (Fed. Cir. 2005) ......................................... 9

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.,* 13-CV-2082, 2015 WL 8153600 (N.D. Ill. Dec. 8, 2015) 18

*Springs Window Fashions LP v. Novo Indus, LP,* 323 F.3d 989 (Fed. Cir. 2003) ...................... 20

*Typhoon Touch Techs, Inc. v. Dell, Inc.,* 659 F.3d 1376 (Fed. Cir. 2011) .................................. 20

*U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554 (Fed. Cir. 1997) .......................................... 2

*Unwired Planet LLC v. Google Inc.,* 111 F. Supp. 3d 1120 (D. Nev. May 26, 2015) ........... 18, 19

## STATUTES

35 U.S.C. § 112 ................................................................................................................... 3, 16

## OTHER AUTHORITIES

*Manual of Patent Examining Procedure* § 2173 ........................................................................ 3

Defendant Zoho Corporation ("Zoho") respectfully submits the following Opening Claim Construction Brief.

## I.    INTRODUCTION

In this case Visible Connections, LLC's ("Visible Connections") asserts two patents—U.S. Patent No. 7,284,203 (the "'203 patent") and U.S. Patent No. 6,665,392 (the "'392 patent").

The claim terms in dispute along with the competing constructions are reflected in the following chart:

| '203 Patent Term | Zoho's proposed constructions | Visicon's proposed constructions |
|---|---|---|
| Preamble of claims 34 and 37 | Limiting | Not limiting |
| Interface program | "A user-facing program that enables a user to initiate application sharing but relies on a separate conferencing program to effect the actual sharing" | No construction needed |
| Call manager | "A server in an IP telephony system that controls call processing for client endpoints, including address resolution, call routing, device configuration and call detail record generation" | No construction needed |
| Substantially real time | Indefinite | WYSIWIS with some amount of propagation delay |
| Document | "Document (as opposed to an application window)" | No construction needed |
| Automatically | "Without human intervention" | No construction need |

| '392 Patent Terms | Zoho's proposed constructions | Visicon's proposed constructions |
|---|---|---|
| Preamble | Limiting | Not limiting |
| When | "At the moment" | No construction needed |

Zoho's proposed constructions properly ascribe to these terms the meanings they "would have to persons in the field of the invention, when read and understood in light of the entire specification and prosecution history." *Fenner Invs., Ltd. v. Cellco P'Ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015). Visible Connections, by contrast, refuses to provide any guidance as to what the claim terms mean.

Moreover, claims 35, 36, 38 and 39 of the '203 patent are indefinite because they improperly combine two statutory classes of claims – system and method – and thus do not "reasonably apprise those skilled in the art of [their] scope." *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1383-84 (Fed. Cir. 2005).

## II.    LEGAL STANDARDS

### A.    Claim Construction Standards

The purpose of claim construction is to resolve the meanings and technical scope of claim terms. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). When the parties dispute the scope of a claim term, "it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

To understand the claims, the court must look to the specification. "It is axiomatic that … [c]laim language must always be read in view of the written description." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). "[T]he specification is always highly relevant." *Phillips*, 415 F.3d at 1315. "Usually, it is dispositive; it is the single

best guide to the meaning of a disputed term." *Id*. "A claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'" *Globetrotter Software, Inc. v. Elan Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004). Where a term could have "several common meanings," the specification "point[s] away from the improper meanings and toward the proper meaning." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms. *Id*. at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field. *Id*.

### B. Indefiniteness Standards

The Patent Act requires a patent claim to "particularly point[] out and distinctly claim[] the subject matter which the inventor [] regards as the invention." 35 U.S.C. §112(b). The primary purpose of this requirement of definiteness of claim language is to ensure that the scope of the claims is clear so the public is informed of the boundaries of the invention. MPEP § 2173. Without a requirement of definiteness, patent applicants would be incentivized to inject ambiguity, resulting in patents that will discourage others to enterprise and experiment for fear of possible infringement claims. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120, 2124 (2014). The role of the definiteness requirement is to eliminate the temptation to use ambiguity to capture activity not properly within the scope of an invention. *Id*. at 2129. In that

regard, the definiteness requirement's role is to ensure that the public has clarity as to what conduct will or will not subject it to legitimate claims of infringement. *Id.*

In determining whether patent claim language meets this definiteness requirement, the Federal Circuit previously held that a claim is definite as long as it is "amenable to construction," invalidating claims only if they are "insolubly ambiguous." *See, e.g., Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). The Supreme Court in *Nautilus* overruled application of this "insolubly ambiguous" standard, finding it too amorphous, effectively perpetuating the ambiguity the definiteness requirement is intended to eliminate. *Nautilus*, 134 S. Ct. at 2124, 2130. It instead held that a patent is indefinite "if its claims, read in light of the specification, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 2124.

## I.    THE '203 PATENT

### A.    Background

As the Field of The Invention explains, the '203 patent is directed to an "**interface program to an *underlying* conferencing program** having application sharing [e.g. shared viewing of documents] capability." Declaration of Ryan J. Marton ("Marton Decl."), Ex. A ('203 Patent) at 1:5-10 (emphasis added). This interface program operates at a layer above an underlying conferencing program and purports to simplify the user's interaction with the conferencing program such that shared viewing of documents is made easier. The notion in the patent was that, at the time of the patent, conferencing programs with application sharing functionality were difficult to use and there was a need for a simplified user interface that sat on top of and hid the underlying conference program, streamlining the user's experience.

The Background section of the patent explains that as of the time of the '203 patent, conferencing programs with application sharing functionality (such as Microsoft's NetMeeting and Intel's ProShare) were difficult to use because these programs "require knowledge on how to use them for conferencing and require knowledge on how to configure them for application sharing." *Id*. at 1:39-42. As an example of such limitation, the patent explains that to use Microsoft's NetMeeting product for application sharing and conferencing:

> a document, if not already open, must [first] be found and opened. This will open an associated application program. After which, NetMeeting must be found and opened. NetMeeting provides a capability of creating a list of names (a directory) or a list of numbers (speed dial list). So, either a name or a number is selected from a list for an instantiation of NetMeeting. After a connection is established, a share menu becomes available. The share menu lists open documents available for sharing. A presenter of a host computer system may then select a document to be shared with an audience member or members of a shadow computer system or systems.

*Id*. at 1:44-53. In other words, according to the patent, NetMeeting and other similar products were in need of improvement because, in those systems, the user had to open documents to be shared before launching the application sharing and conferencing program. Thus, according to the '203 patent, "it would be desirable to enable a user to share applications without having to have any knowledge of an underlying application." *Id*. at 1:55-58.

The patent's solution is an interface program that "facilitates application sharing by reducing it to a two-step process hiding underlying details from a user." *Id*., Abstract. The Abstract further explains:

> [The] interface program *in cooperation with a conferencing program* facilitates application sharing by enabling a user to select one or more files and one or more participants…. This interface program provides both an application list and a participant list to facilitate the user's selection thereof.

*Id*. (emphasis added). Simplifying a user's interaction with an underlying conferencing program, the interface program reduces electronic document sharing to a two-step process: enabling the

user to initiate document sharing by merely selecting one or more documents for sharing and

then selecting one or more people with whom to share the documents. The patent explains:

> [T]his interface program allows application sharing to be …
> established by selecting one or more documents to be shared and
> one or more participants with whom to share such one or more
> documents. After which, connectivity and any associated activity is
> automatically initiated.

*Id*. at 2:2-7. The patent reflects the two-step process enabled by the interface program:



FIG. 3

*Id*., Figure 3. Figure 5A and 5B also depicts the interface program's two-step process:



*Id.*, Figs. 5A and 5B. Figure 5A shows the list of documents for selection. Figure 5B shows that

after a document is selected (here "Specification.doc") a "Share View With" drop down menu

becomes available where the user can select recipients. After that, with no further action from

the user a connection is established and the selected document(s) is shared with the selected

recipient(s). *See e.g.*, *id.* at 2:2-7, 4:30-45, Fig. 3.

Figure 1 shows a block diagram of a computer with invention (108) used in conjunction with an underlying conferencing program (112):



FIG. 1

The patent explains that Figure 1 shows a computer with the invention, including memory (103) having one or more documents (113), the underlying conferencing program (112) and the separate interface program (108). *Id.* at 3:24-30. It further explains that "[t]he conferencing program 112 may be a conferencing program such a NetMeeting, ProShare and the like configured for application sharing. *Id.* at 3:55-58.

According to the patent, "[b]ecause interface program provides a *separate* interface from an underlying conferencing application, application sharing without user knowledge of the underlying conferencing program [such as NetMeeting or ProShare] is facilitated[.]" *Id.* at 4:38-41 (emphasis added). This separation between the interface program and the underlying conferencing and application sharing program, according to the patent, "leads to a benefit of requiring fewer steps than previously required." *Id.* 4:47-48.

The interface program is also purported to be able to provide status information regarding participants in the conferencing and application sharing. According to the patent, it does this by

working in conjunction with a "call manager." *Id*. at 11:45-65. The patent explains that call

managers are "well known in telecommunications" and are used to manage calls to and from

client computers – as well as maintaining status information associated with those calls. *Id*.

Here, according to the patent, the interface program uses the status information from the call

manager "to provide a participant list."

## B. Asserted Claims

Visible Connections asserts infringement of claims 34-39. These claims are directed to

the "interface program" described in the specification working in conjunction with a "call

manager." Claims 34 and 37 are independent with claims 35 and 36 depending from claim 34

and claims 38 and 39 depending from claim 37.

Claim 34 which is representative of the asserted independent claims for claim

construction purposes recites:

> A system for application sharing, comprising:
>> a call manager, the call manager having an interface program;
>> a plurality of communication devices for electrical communication with the call manager;
>> the call manager configured to manage calls to and from the plurality of communication devices for establishing connectivity for the application sharing; and
>> the interface program in cooperation with the call manager configured to maintain status information regarding the connectivity, the status information including current number of active participants.

This, like all the asserted claims, is a system claim "for application sharing." The system

includes a "call manager" that manages calls to and from a plurality of communication devices

(e.g. computers) "for establishing connectivity for application sharing" and an interface program

that (in cooperation with the call manager) maintains status information regarding such

connectivity in including the current number of active participants. In short, this claim is

directed the "interface program" described in the specification working in conjunction with the "call manager" to maintain the current number of people involved in the sharing.

Claim 35, which depends from claim 34 recites:

> The system of claim 34, wherein the interface program automatically establishes at least a substantially real-time shared viewing of at least one document between at least one audience member and a host user, wherein the host user only selects the at least one document to be shared and the at least one audience member with whom to share the at least one document to initiate the substantially real-time shared viewing.

This claim adds functionality to the "interface program" in claim 34 – namely that it automatically establishes "substantially real-time shared viewing" of a document between an audience member and a host user. It also requires that the "host user" select at least one document and at least one audience member to initiate the sharing. Claims 36, 38 and 39 also have the requirements set forth in claim 35.

## C.    '203 Patent Claim Terms for Construction

### 1.    Preambles of claims 34 and 37

The preambles, "[a] system for application sharing comprising", in claims 35 and 37 provide an antecedent for "the application sharing" found in the bodies of the claims. Accordingly, because the preambles provide antecedent basis, they are limiting. *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005); *Mobile Telecomms. Techs., LLC v. Leap Wireless Int'l, Inc.*, No. 2:13-CV-885-JRG-RSP, 2015 WL 2250056, at *12-13 (E.D. Tex. May 13, 2015) (preamble reciting "a plurality of transmitters" "recite[s] essential structure" and is limiting "in light of the extensive use of these preambles to provide antecedent basis for ["said plurality of transmitters"] terms used in the bodies of the claims").

## 2. Interface Program

"Interface program" should be construed as "a user-facing program that enables a user to initiate application sharing but relies on a separate conferencing program to effect the actual sharing." *See* Declaration of Keith A. Lantz ("Lantz Decl.") at ¶¶ 34-39. In all instances in the specification the "interface program" is described as a program that is separate from an underlying conferencing program. *See e.g.* '203 Patent at 4:37-40 ("[b]ecause interface program provides a *separate* interface from an underlying conferencing application, application sharing without user knowledge of this underlying conferencing program is facilitated"); 1:5-10 ("The invention relates … specifically, to an interface program to an *underlying* conferencing program having an application sharing capability."); Abstract ("This interface program in cooperation with a conferencing program …."). Figure 1, depicted above shows the conferencing program 112 as something separate from the interface program 108 and the patent explains that "[c]onferencing program may be a conferencing program such as [Microsoft's] NetMeeting, [Intel's] ProShare and the like[.]" *Id*. at 3:55-57. Indeed, the entire notion behind the "invention" is that interface program facilitates easier use of underlying conferencing programs. *Id*. at 1:15-2:27; 4:37-52 (explaining that an interface to existing conferencing program is needed to enable a user to share application "without the user having knowledge of [the] … underlying conferencing program."). The patent explains that the conferencing program, which has its own interface (separate from the "interface program" the patent claims to have invented), can be made entirely "transparent" to the user. *Id*. at 4:43-45. All aspects of the underlying conferencing program including its own native interface can be hidden from the user. *Id*. at 4:45-47 ("the interface program 108 may include a user selectable command line to hide a user interface for such underlying conference program.").

Given that "the invention" is specifically described as "an interface to an *underlying* conferencing program," the purpose of the invention is provide an interface program that is a "*separate* interface to an underlying conferencing [program]" to enable more efficient use of the conferencing program and every instance of interface program described in the specification is separate from an underlying conferencing program, the appropriate construction of interface program is that it is separate from an underlying conferencing program. "It is axiomatic that … [c]laim language must always be read in view of the written description." *Retractable Techs., Inc.,* 653 F.3d at 1305. "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* "A claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'" *Globetrotter Software, Inc.,* 362 F.3d at 1381.

### 3. Call Manager

Call manager is referenced only a few times in a small section at the end of the specification. '203 Patent at 11:46-65. The specification merely states that "call managers" are "well known in telecommunications" and states that call managers "manage calls of clients" and maintain "connection status information." *Id.* But the patent does not say what a call manager is.

Extrinsic evidence, however, shows that "call managers" were known at the time in telecommunications (and, in particular IP telephony). Lantz Decl. at ¶¶ 28-33. In fact, one skilled in the relevant art, would have understood a call manager to be a "a server in an IP telephony system that controls call processing for client endpoints, including address resolution, call routing, device configuration and call detail record generation." *See id.*

As Dr. Lantz, Zoho's expert explains, in the context of the '203 patent specification, one skilled in the art would have understood "telecommunications" to be referring principally to Internet Protocol-based networking and in particular Internet Protocol-based telephony ("IP telephony"). *Id*. at ¶ 29. In this context, a call manager would have been understood by one skilled in the art to be a call processing server or call control server that provided several core functions in an IP telephony system, including address resolution, call routing, device configuration, and call detail record (CDR) generation. *Id*.

In his declaration submitted herewith, Dr. Lantz explains that "a typical IP telephony system in the late 1990's was composed of three principal entities: (1) endpoints such as IP-based, digital handsets (telephones) or personal computers, (2) a call manager (often called a call control server or call processing server) and (3) gateways to interface with other types of networks, including the public switched telephone network (PSTN)." *Id*. at ¶ 30.

In these systems, the call manager served a similar role to a human switchboard operator in a traditional telephone system in that it was responsible for connecting one endpoint to another. *Id*. at ¶ 31. For example, when a call was made by a client endpoint (such as an IP phone) in an IP telephony system, in order for a connection to be made, the call would have been processed by the call manager. *Id*. As part of this processing, the call manager is responsible for address resolution and call routing. *Id*. That is, the call manager determines the address of the intended call recipient endpoint and routes the call to that endpoint. *Id*. The call manager is also responsible for endpoint device configuration. *Id*. This enables the call manager to recognize the endpoint and vice versa. *Id*. The call manager also maintains information about calls including the originating endpoint, the recipient endpoints and the length of the call. *Id*. This is often referred to as detail record (CDR) generation. *Id*.

As an example, one of the best-known IP telephony systems of the late 1990s was the

Selsius Systems CallManager (acquired by Cisco in 1998). *Id*. at ¶ 32. The CallManager in this

system was described as "the call routing and signaling component for *IP telephony*[.]" *Id*. at ¶

32, Ex. A (p. 3). The following diagram shows the basic architecture of that system:



**Figure 1-4** *Cisco CallManager in 1997*

*Id*. at Ex. A (p. 13). As can be seen in the diagram, the CallManager was a server that processed

the calls in the IP telephony system between endpoints such as IP phones and networked

computers. Documentation regarding the Selsius CallManager from November 1998 provides

that the CallManager "controls call processing, routing, many phone features, device

configuration and system settings." Id. at Ex. B (p. 9). The documentation also provides that

"[a]ll devices on a Selsius system are configured and controlled using the CallManager." *Id*.

There were several other IP telephony systems from the late 1990's, including ShoreTel's

CrystaLAN IP-PBX, NBX Corporation's NBX 100 (acquired by 3Com in 1999), and Vertical

Networks' InstantOffice. Each of these systems had call managers (*i.e.* call control servers) that

perform a role equivalent to that performed by the call manager in the Selsius system. *Id*.

As such, in the context of the '203 patent and telecommunications in 1999, one skilled in the art would have understood a "call manager" to be "a server in an IP telephony system that controls call processing for client endpoints, including address resolution, call routing, device configuration and call detail record generation."

### 4. Claims 35, 36, 38 and 39 Are Indefinite Because They Impermissibly Combine Apparatus and Method Claim Elements

Claims 35, 36, 38 and 39 of the '203 Patent are invalid as indefinite because they improperly combine two statutory classes of claims – system and method – and thus do not "reasonably apprise those skilled in the art of [their] scope." *IPXL Holdings, LLC*, 430 F.3d at 1383-84. Such claims are "not sufficiently precise to provide competitors with an accurate determination of the 'metes and bounds' of protection involved," because it is unclear whether infringement occurs when the claimed system is created or when the method steps are performed. *Id.* at 1384 (citation omitted).

In *IPXL*, the Federal Circuit held that a *system* claim that included a *method* step performed by a user was indefinite and invalid. The claim term at-issue was:

> The *system of claim 2* [including an input means] wherein the predicted transaction information comprises both a transaction type and transaction parameters associated with that transaction type, and **the user uses the input means** to either change the predicted transaction information or accept the displayed transaction type and transaction parameters.

*Id.* (emphasis in original). The Federal Circuit held that "it is unclear whether infringement of [the claim] occurs when one creates a system that allows the user to change the predicted transaction information or accept the displayed transaction, or whether infringement occurs when the user actually uses the input means to change transaction information or uses the input means to accept a displayed transaction." *Id.*

Similarly, in *Rembrandt Data Techs., LP v. AOL, LLC,* 641 F.3d 1331 (Fed. Cir. 2011), the Federal Circuit, citing *IPXL Holdings,* held that a claim to an apparatus (*i.e.,* "a data transmitting device") that included the method step "transmitting the trellis encoded frames" was invalid for indefiniteness because it improperly recited an apparatus and method steps in the same claim. *Id.* at 1339-40. The Court also explained that it could not fix the patentee's invalid choice of claim language: "We have stated that this court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity." *Id.* at 1339-40 (citations omitted).

Moreover, in *Katz Interactive Call Processing Patent Litig. v. Am. Airlines, Inc.*, the claims at issue read: "An interface control system . . . comprising: interface means for providing automated voice messages . . . to certain of said individual callers, wherein said certain of said individual callers digitally enter data." 639 F.3d 1303, 1318 (Fed. Cir. 2011) (emphasis added). The Federal Circuit held that these "claims . . . create confusion as to when direct infringement occurs because they are directed both to systems and to actions performed by 'individual callers.' Katz's claims therefore fall squarely within the rationale of *IPXL* and are indefinite." *Id.*; *see also H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1335-35 (Fed. Cir. 2014) (holding claim to "tangible computer readable medium" indefinite which included limitation "wherein said user selects").

As explained above, claims 35, 36, 38 and 39 all require an "interface program" that establishes "substantially real-time shared viewing" of a document between an audience member and a host user – and requires that the "host user" select at least one document and at least one audience member to initiate the sharing. These claims unquestionably require system elements – namely an "interface program" that establishes "substantially real-time shared viewing" of a

document – and requires user action – namely, the user "selects the at least one document to be shared and the at least one audience member with whom to share the at least one document." This mix of both system and method elements renders the claims invalid under 35 U.S.C. § 112(b) as a matter of law. Indeed, the claim language is nearly identical to the claim language that *IPXL, Katz,* and *H-W Techs.* held rendered system claims invalid.

This is not a situation where the method steps are properly characterized as system capabilities or configurations. *Katz* rejected the same argument, explaining that the presence of user steps ends the inquiry: "[l]ike the language used in the claim at issue in IPXL ('wherein . . . the user uses'), the language used in Katz's claims ('wherein . . . callers digitally enter data' and 'wherein . . . callers provide . . . data') is directed to user actions, not system capabilities." *See Katz*, 639 F.3d at 1318. It is thus unclear whether infringement of these claims occurs when one creates a system or when the method steps are performed. Accordingly, these claims are indefinite and invalid.

### 5. Claims 35, 36, 38 And 39 Are Indefinite Because They Include a Term of Degree Without Specifically Delineated Metes and Bounds

Claims 35, 36, 38 and 39 are indefinite for another reason independent from *IPXL* issue raised immediately above. Each of these claims include the phrase "substantially real-time shared viewing." The patent defines this term as "WYSIWIS [what you see is what I see] with *some amount* of propagation delay." '203 Patent at 1:35-38. This is, in fact, how Visible Connections proposes the term should be construed. However, "some amount of propagation delay" fails to provide adequate precision. Is a one second delay within the bounds of "some amount"? Is a two second delay within the bounds? The patent does not provide the answer. This phrase ("some amount") is a term of degree with no boundaries. It gives no guidance as to

what is within the bounds of the claims and what is out of bounds. *See* Lantz Decl. at ¶ 40. As such the claims with this limitation (35, 36, 38 and 39) are indefinite. *Id*.

When terms of degree are used in claim, such is the case here, "the patent's specification [must] suppl[y] some standard for measuring the scope of the phrase." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005). Here, neither the specification nor the prosecution history provide any objective boundaries for "some amount" and thus "fail[] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc.,* 134 S. Ct. at 2124. When a patent uses terms of degree such as this, the intrinsic record needs to provide "objective boundaries" such that the public knows the scope of the patent owner's potential monopoly. *Interval Licensing, LLC v. AOL, Inc.*, 766 F. 3d 1364, 1371 (Fed. Cir. 2014). Although "absolute or mathematical precision is not required, … [i]t cannot be sufficient that a court can ascribe *some* meaning to a patent's claims." *Nautilus*, 134 S. Ct. at 2120 (emphasis in original). "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningful precise claim scope." *Halliburton Energy Servs.,* 514 F. 3d 1244, 1251 (Fed. Cir. 2008). Here there is no way to measure "some amount of propagation delay." This is fatal to the claims.

Both before and since *Nautilus*, the Federal Circuit has invalidated claims where the specification and prosecution history fail to provide objective guidance to determine the scope of a term of degree. *See, e.g.*, *Interval Licensing*, 766 F. 3d at 1371 (finding the term "unobtrusive manner that does not distract a user" indefinite); *Datamize*, 417 F.3d at 1351 (finding the term "aesthetically pleasing" indefinite); *In re Walter*, 698 Fed. Appx. 1022 (Fed. Cir. 2017) (holding that the term "block-like" was indefinite because it "is a term of degree without any

accompanying guidance in the intrinsic record for determining its scope;" and even though it "ostensibly covers a range of shapes that are sufficiently 'like' a 'block' and excludes those that are not," "nothing in the intrinsic record offers 'objective boundaries' for ascertaining whether a given shape falls into either category," and expert failed to provide evidence supporting his opinion that it was a term of art in structural engineering field).  As have a number of district courts.  *See, e.g.*, *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 13-CV-2082, 2015 WL 8153600, at *9-*18 (N.D. Ill. Dec. 8, 2015) (finding the term "visually negligible" indefinite); *Unwired Planet LLC v. Google Inc.*, 111 F. Supp. 3d 1120, 1129-1131 (D. Nev. May 26, 2015) (finding the term requiring an image to be "much larger" than a display indefinite); *Qcue, Inc. v. Digonex Techs., Inc.*, A-12-CA-484-SS, 2013 WL 4784120, at *10 (W.D. Tex. Sept. 5, 2013), *aff'd*, 575 F. App'x 895 (Fed. Cir. 2014) (finding the term "at or near" indefinite); *Effective Exploration, LLC v. Bluestone Nat. Res. II, LLC*, 2017 WL 3193322, at * 22 (E.D. Tex. July 27, 2017) (term "extend in substantially opposite directions" held indefinite); *Fiber, LLC v. Ciena Corp.*, 2017 WL 3896443 (D. Colo. Sep. 6, 2017) (term "substantially complete set" held indefinite where "[t]here is nothing in the specification that clarifies what portion of a 'complete set' would be a 'substantially complete set,' " as it could be a majority or at least one); *Fairfield Indus., Inc. v. Wireless Seismic, Inc.*, 2015 WL 1034275, at *16 (S.D. Tex. Mar. 10, 2015) (holding term "substantially prevent communication interference" to be indefinite where "the specification and prosecution history lack evidence that would inform a person skilled in the art as to how much interference prevention the patent contemplates sets it apart from patents that have overcome indefiniteness challenges").

All of these cases are on point but *Unwired Planet* is particularly instructive.  There, Unwired Planet asserted select claims that recited the phrase "an image having dimensions much

larger than the dimension of the screen," which Google argued was indefinite. *Id* at 1129. The patent included several passages relating image size to display size, including one concrete example. *Id.* at 1129-1130. Unwired Planet's expert opined that in order to be "much larger," "one dimension of an image — either its width or its height — must be at least twice as large as the corresponding width or height of the screen." *Id.* at 1130. The Court concluded that though specification gave some guidance to what "much larger" could mean it failed to provide measurable boundaries and, thus, the claims were indefinite under *Nautilus*. *Id.* at 1130-1131.

The claims at issue here present the same uncertainty at issue in *Unwired Planet*. Indeed, "much larger" from *Unwired Planet* is no different from "some amount." Accordingly, claims 35, 36, 38 and 39 should be invalidated under 35 U.S.C. § 112.

### 6. Document (Claims 35, 36, 38 and 39)[1]

"Document" should be construed as "document (as opposed to application window)". This construction comes directly from Visible Connections' First Amended Complaint. *See* Dkt. No. 14, ¶ 50 ("A person skilled in the art at the time of the inventions claim in the '203 Patent would understand the improvements of claim 35 of the '203 Patent allow the users to share documents (as opposed to application windows) ….").

This construction is also consistent with how the patentee and the Patent Trial and Appeal Board described the invention during prosecution. In response to an Office Action rejecting claims involving selection of "documents" for sharing where the Patent Office identified prior art involving selection of application windows that could be open on documents, the patentee distinguished the prior art arguing that selection of application windows (even open on

---

[1] The Court need not construe "document" if it deems claims 35, 36, 38 and 39 indefinite under either ground raised above.

documents) was different than selection and sharing of documents as claimed by the patent. *See* Marton Decl., Ex. B, pp. 15-16 ("Katsurabayashi plainly teaches, at most determining which windows in an application that user should see, rather than determining a selection of documents."). Then again in an appeal to the Patent Trial and Appeal Board during prosecution of the '203 patent, the patentee distinguished Katsurabayashi on the same grounds:

> Nothing in Katsurabayashi says anything about selecting a document or documents for sharing. In fact, Katsurabayashi plainly teaches, at most, determining which windows in an application that a user should see, rather than determining a selection of documents or files to be provided in a shared view as is required by Appellants' claims.

*Id.*, Ex. C. pp. 7-8. The Patent Trial and Appeal Board agreed with patentee holding that "we are unpersuaded that selecting and sharing windows would appear to have suggested selecting and sharing at least one document." *Id.*, Ex. D., pp. 8-9.

These representations make clear that "documents" in the '203 patent are distinct from application windows. As such, Zoho's proposed construction is correct. Indeed, it is well established that where a patentee distinguishes the claimed invention over the prior art, "an applicant is indicating what the claims do not cover, he is by implication surrendering such protection." *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997); *see also Springs Window Fashions LP v. Novo Indus, LP*, 323 F.3d 989, 995 (Fed. Cir. 2003); *Chimie v. PPG Indus., Inc.,* 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("the prosecution history ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers"); *see also Typhoon Touch Techs, Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) (citing *Phillips*, 415 F.3d at 1317) ("The patentee is bound by representations made and actions that were taken in order to obtain the patent."); *Fenner Investment Co. v. Cellco Partnership,* 778 F.3d 1320, 1323 (Fed. Cir. 2015) ("Any explanation,

elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual invention that is disclosed, described, and patented."). Courts must therefore "take the patentee at its word" and "not construe the scope of [the] patent's claims more broadly than the patentee itself clearly envisioned." *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004).

### 7. Automatically (Claims 35, 36, 38 and 39)[2]

"Automatically" should be construed as "without human intervention." Lantz Decl. at ¶ 41. As is explained above, a key part of the '203 patent "invention" is that document sharing is reduced to a two-step process whereby the user only needs to select a document and person to share it with to initiate the sharing. After those two actions are taken the interface program "automatically" establishes the shared viewing of the document. This means that the interface program requires no further human action to establish the shared viewing. Consistent with patent, the IBM Dictionary of Computing defines automatic as "pertaining to a process … that … functions without intervention by a human operator." Marton Decl., Ex. E. Thus, Zoho's proposed construction captures what is meant by automatically.

## III. THE '392 PATENT

### A. Background

The '392 patent also relates to telecommunications conferencing systems. Specifically, it facilitates participants connecting to a conferencing system via both a voice (telephone) and data connection (website). The patent explains that "conference call systems that integrate personal computers with telephones often need to establish an operational association between a user's

---

[2] The Court need not construe "document" if it deems claims 35, 36, 38 and 39 indefinite under either ground raised above.

computer screen and that user's telephone line." Marton Decl., Ex. F ('392 patent at 1:25-28).

According to the '392 patent, prior systems associated a participant's telephone and data

connection in a conference by pre-registering the participant and assigning a unique ID to the

participant. *Id*. at 49-55. The drawbacks to these prior systems was that they required users to

pre-register with the system and then to remember their unique ID. *Id*. at 1:55-60.

The '392 patent invention purports to overcome these shortcomings and associate a

participant's voice and data connection in a conference by (1) generating a unique temporary

code when a data connection is established between the participant and the conference call

system, (2) displaying the code over the data connection to the participant on that participant's

computer screen; and (3) instructing the participant to enter the code over his telephone

connection. *Id*. at 2:34-45.

## B.    Asserted Claim of the '392 Patent

Visible Connections asserts infringement of claims 1 and 5 of the '392 patent. Claim 1 is

the independent claim (from which claim 5 depends) and recites the exact approach described in

the specification for overcoming the disadvantages of the prior art:

> 1.  A method of operationally associating a participant's telephone connection to a
> conference call system with a data connection from said participant's computer
> screen to said conference call system, said conference call system establishing
> voice connections between itself and multiple conference call participants, said
> method comprising the septs of:
>        generating a unique temporary code when a data connection is established
> between said participant and said conference call system;
>        displaying said code over said data connection to said participant on that
> participant's computer screen; and
>        instructing said participant to enter said code over his telephone
> connection to the conference call system.

As shown in Figure 3, the specification describes the application of this approach to three

different scenarios:

*FIG. 3*



'392 patent, Fig. 3. In a first "web then dial-in" scenario, a participant first establishes a data connection with the conferencing system through a web browser. *Id*. at 2:19-22; 2:56-3:5; 4:62-5:62. Specifically, the participant goes to the conference provider's website and enters an access code. *Id*. at 4:67-5:4; 5:28-34 (describing steps 41, 43 of Fig. 3). As the patent explains, "a valid access code causes they system to generate a personal identification number (PIN) that is unique within the intended conference, and the system displays it on a web page assigned to the participant, along with instructions on the phone number to dial and how to enter the access code and PIN." *Id*. at 5:5-9; 5:34-47 (describing steps 45, 49 of Fig. 3).

In a second "dial-in, then web" scenario, the patent explains that a participant dials-in to a conference bridge through a telephone, enters an access code, and then is instructed to go to the conference provider's website. *Id*. at 5:63-6:2; 6:24-28 (describing steps 61, 63 of Fig. 3). If the participant the joins the conference through the provider's website, the system generates a code that is displayed on a web page to the participant with instructions on how to enter the code into the participant's telephone connection. *Id*. at 6:3-12; 6:29-36 (describing steps 65, 67 of Fig. 3).

The patent then describes a third "dial-out, then web" scenario in which a participant receives from the conference provider a telephone call initiated by a conference host. 6:53-55; 7:15-20 (describing steps 81, 83 of Fig. 3). After answering the call, the participant can then join through the provider's website, at which point – just like in scenario two - the system generates a temporary code and displays it to the participant along with instructions on how to enter the code in the telephone call. *Id*. at 6:59-7:7; 7:20-27 (describing steps 65. 67 of Fig. 3).

In each of these scenarios, the conference system generates a code and displays it to the participant with instructions on how to enter the code into a telephone connection.

### C. The '392 Patent Claim Terms for Construction

#### 1. Claim 1 Preamble

Visible Connections disputes that the preamble of claim 1 is limiting. Again, claim 1 of the '392 patent states:

> 1. A method of operationally associating a participant's telephone connection to a conference call system with a data connection from said participant's computer screen to said conference call system, said conference call system establishing voice connections between itself and multiple conference call participants, said method comprising the septs of:
> generating a unique temporary code when a data connection is established between said participant and said conference call system;
> displaying said code over said data connection to said participant on that participant's computer screen; and
> instructing said participant to enter said code over his telephone

connection to the conference call system.

It has been long understood that a claim preamble is limiting if the word are "necessary to give life, meaning, and vitality to the claims." *Kropa v. Robie*, 187 F.2d 150, 861 (CCPA 1951). That is very much the case here. Without the preamble, the claim requires only that a code be generated and displayed along with instructions. These steps do not make sense without the preamble, let alone constitute an invention. And indeed, the specification makes clear that the preamble is necessary to define the invention as a method for associating a telephone call and data connection in a conferencing system. *See* '392 patent at 1:62-67 ("The *invention* enables a conference call system to establish efficiently an operational association between a particular user's computer on a public data network . . . and that same user's telephone on the public switched telephone network (PSTN)") (emphasis added); *Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006).

Moreover, the preamble is grammatically essential to the claim, providing the antecedent basis for the conference system and the conference participant. Under such circumstances, the Federal Circuit has routinely found the preamble limiting, as the Court should do here. *See Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-09 (Fed. Cir. 2002); *Bicon, Inc. v. Strauman Co.,* 441 F.3d 945, 952 (Fed. Cir. 2006).

### 2. "generating a unique temporary code _when_ a data connection is established"

Zoho proposes the phrase "generating a unique temporary code *when* a data connection is established" to mean "generating a unique temporary code *at the moment* a data connection is established." In *Info-Hold, Inc. v. Muzak, LLC*, 783 F.3d 1365, 1374 (Fed. Cir. 2015), the Federal Circuit construed the term "when" to mean "at the time." In *Info-Hold*, the parties disputed whether a claim's requirement that messages be played back "when a caller is placed on

hold" meant that message playback starts "at the time a caller is placed on hold" or whether playback can occur at any time so long as it also occurs when a caller is placed on hold. *Id*. at 1373. The Federal Circuit affirmed the district court's construction of "when" as requiring that playback start "at the time" a caller is placed on hold, finding there was no disclosure in the specification of playback happening at any other time. *Id*. at 1374.

The specification here similarly compels a construction of "when" as "at the time." Such a construction faithfully reflects the specification's description of the '392 patent invention, where the conference call system generates a temporary code only at the time a participant establishes a data connection to the conference. Indeed, in each of the scenarios described in the specification, the participant connects to the conference through the conference provider's website and at that time, the system generates a temporary code. *E.g.* '392 patent at 5:4-6 (the participant connecting to the conference through the provider website "causes the system to general a personal identification number (PIN) that is unique within the intended conference"); 6:3-4 ("If the user then goes to the web site and clicks on the View button, the system generates a temporary match code."); 7:47-50 ("a participant goes directly to a URL that already includes the access code. As before, a PIN is automatically generated"); Fig. 3 (steps 45 to 49, steps 65-67). Accordingly, Zoho respectfully requests that "when" as used in claim 1 of the '392 patent be construed to mean "at the time."

## IV.    CONCLUSION

Accordingly, Zoho respectfully requests that the Court adopt its proposed constructions.

Respectfully submitted,

Ryan Marton (admitted *pro hac vice*)
Hector Ribera (admitted *pro hac vice*)
Carolyn Chang (admitted *pro hac vice*)
MARTON RIBERA SCHUMANN & CHANG LLP
548 Market Street, Suite 36117
San Francisco, CA 94104
Telephone:    (415) 360-2511
Email:          ryan@martonribera.com

Mathew Powers (SBN 24046650)
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2200
Austin, Texas 78701
(512) 480-5725 Telephone
(512) 536-9938 Telecopier
Email:          mpowers@gdhm.com

By:        */s/ Ryan J. Marton*

ATTORNEYS FOR DEFENDANT ZOHO CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing is being served on all counsel

of record via the CM/ECF system on this 23ᵗʰ day of September, 2019.


By:       */s/ Ryan J. Marton*
            Ryan J. Marton